820 P.2d 380

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Raul Delarosa HERNANDEZ, Defendant–Appellant.**

**Nos. 18762, 19027.**

Court of Appeals of Idaho.

Nov. 5, 1991.

Van G. Bishop, Nampa, for defendant-appellant.

Larry J. EchoHawk, Atty. Gen., Richard S. Christensen, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

Raul Hernandez was found guilty by a jury of three counts of delivery of a controlled substance, cocaine, and three counts of violating the 1989 version of the Illegal Drug Stamp Tax Act. *See* I.C. § 37–2732(a)(1)(A); I.C. § 63–4206(2). He appeals his convictions, challenging the failure of the court to appoint an interpreter, his sentences, and the district court's denial of his I.C.R. 35 motion to reduce his sentences.[1] We vacate the judgments of conviction and sentences regarding the Illegal Drug Stamp Tax Act because the version

---

1. Separate notices of appeal were filed by Hernandez both from the judgments of conviction and from the order denying relief under Rule

35. The Supreme Court subsequently granted a motion by Hernandez to consolidate these appeals.

of the Act under which Hernandez was found guilty has since been declared unconstitutional by the Idaho Supreme Court. However, we affirm the other judgments of conviction and sentences and the order denying relief under Rule 35.

## Facts

Hernandez was charged by a grand jury with making three separate deliveries of cocaine on August 24, September 5, and September 11, 1989, to a confidential informant of the Drug Enforcement Administration and a local undercover officer. The evidence did not establish that Hernandez had personally handed cocaine to the police. Rather, his conviction was based on the testimony of officers, cassette tape recordings made by the informant and the police of conversations the informant had with his contact, Mario Reyes, video tapings of the drug deals by the police, and by the statements of the informant concerning what Reyes said about working for Hernandez.

The August 24 delivery occurred in a park in Nampa. The undercover officer and the informant purchased the drugs through Reyes. The transaction had been negotiated by the informant and Hernandez the day before at a local bar, with Reyes acting as the conduit between the two. Evidence showed that Hernandez gave four ounces of cocaine to Reyes who delivered the drugs to the informant, who in turn delivered the cocaine to an undercover officer the next day, August 24. Thereafter, the informant paid $4,400 to Reyes, who then paid Hernandez.

The September 5 transaction found Reyes selling another four ounces of cocaine to the informant. However, the purchase was negotiated through Hernandez, who later reportedly accepted the "buy money" for the sale. The September 11 transaction came about through direct negotiations on September 10 with Hernandez, who was later video-taped accepting $15,000 as payment for the drugs.

Hernandez pled not guilty and denied he was involved with the drug deals. Before trial, he moved to have an interpreter appointed to assist him with his defense. The court denied the motion, determining that although Hernandez could not read or write English, he could speak and understand the language. The jury found him guilty on all charges. On each of the three delivery charges, the court sentenced Hernandez to ten-year determinate terms of confinement, to be followed by indeterminate periods of fifteen years, with these sentences to be served concurrently. For each of the three Illegal Drug Stamp Tax Act violations, the court imposed a one-year minimum sentence, to run concurrently with the other sentences. Hernandez later moved to reduce his sentences under I.C.R. 35 and the court denied the motion.

## Issues

On appeal, Hernandez argues that the trial court erred in that it (1) refused to appoint an interpreter; (2) admitted hearsay evidence of a conspiracy between Hernandez and Reyes to deliver cocaine, when no conspiracy was charged and the state did not make a prima facie showing that a conspiracy existed before introducing the evidence; (3) convicted him of violating the Illegal Drug Stamp Tax Act when that Act was unconstitutional; (4) refused to give credit for jail time already served against each sentence the court imposed; (5) imposed sentences that are too severe; and (6) erroneously denied his Rule 35 motion to reduce his sentences.

## Interpreter

■ Herandez argues that he does not read or write English and therefore the court erred when it refused to appoint an interpreter to help with his defense. Our review of the record indicates that although Hernandez is illiterate in both English and Spanish, he understood the proceedings. Therefore, we hold that there was no error.

■ Idaho Criminal Rule 28 and I.C. § 9–205 are nearly identical and require that in any action

> in which any party or witness does not understand or speak the English language, or who has a physical handicap which prevents him from fully hearing or

speaking the English language, then the court shall appoint a qualified interpreter to interpret the proceedings. . . .

As indicated by the rule, a court's inquiry when deciding whether to appoint an interpreter is whether the defendant can understand and speak English, not whether he can read and write the language. If the defendant cannot understand and speak English, the judge must appoint an interpreter or the defendant's trial would violate due process because he would not be afforded a meaningful day in court. *State v. Faafiti*, 54 Haw. 637, 513 P.2d 697 (1973). Generally, whether to appoint an interpreter after the defendant has requested one is a decision resting within the trial court's discretion, and the decision will not be overturned unless the defendant shows that the discretion has been abused. *State v. Mendez*, 56 Wash.App. 458, 784 P.2d 168 (1989); *State v. Trevino*, 10 Wash. App. 89, 516 P.2d 779 (1973). *See also State v. Grubbs*, 117 Ariz. 116, 570 P.2d 1289 (App.1977); *State v. Van Pham*, 234 Kan. 649, 675 P.2d 848 (1984); *State v. Coria*, 39 Or.App. 507, 592 P.2d 1057 (1979). The test the appellate court must apply to determine if the lower court abused its discretion is whether the failure to appoint an interpreter denied the defendant his right to a fair trial, with all the due process considerations that accompany that right: the ability to communicate with his attorney, understand the proceedings, assist in his defense, and meaningfully confront witnesses. *Application of Murga*, 631 P.2d 735 (Okla.1981). *See also State v. Grubbs*, 570 P.2d at 1289; *State v. Van Pham*, 675 P.2d at 848 (test for abuse is whether failure to appoint an interpreter hampered defendant in presenting his case to jury).

■ We note that Hernandez has not submitted a transcript of his arraignment or of the hearing on his motion for appointment of an interpreter. It is the appellant's burden to submit a record to support his argument. Because he has not submitted the transcripts, we must rely on the information present in the record as it exists, that is, the court minutes of the arraignment and the hearing on the motion

for the interpreter, Hernandez' testimony at trial, and other relevant material.

Hernandez was born in Texas and there attended the first and second grades. When his family moved to Idaho, he enrolled in the third grade and completed the seventh grade before quitting. Read in combination, the court minutes for December 4, 1989, and Hernandez' presentence report reveal that he is illiterate in both English and Spanish. Because Hernandez cannot read, his attorney read the Indictment to him and the court minutes state that "the defendant concurred." In other words, there was no indication at that stage or any later stage of the trial that he did not understand the charges against him or the proceedings. Later, defense counsel stated that Hernandez only needed help with "large words," and Hernandez made similar statements to the court. An examination of his testimony at trial reveals that he had no trouble understanding the questions posed by counsel or the comments of the court and that he was able to respond quickly, clearly, and completely in English.

Based on these facts, we find nothing that indicates Hernandez was denied a fair trial because he was unable to communicate with counsel or the court. Therefore, we hold that the court did not abuse its discretion when it refused to appoint an interpreter.

### Conspiracy Evidence

■ Next, Hernandez asserts that the court erred by admitting into evidence the statements of his alleged coconspirator, Mario Reyes, because the statements were hearsay, a conspiracy to sell cocaine was never charged, and the state did not show that a conspiracy existed before it introduced the statements. Reyes refused to testify at trial. The court allowed the DEA's confidential informant to testify to Reyes' statements on the basis that the state would establish the conspiracy later in the trial. The court stated that "based in part upon the representations made by the prosecutor, the court does find that at that point, there was a beginning—at least beginning stages of conspiracy so I'm go-

ing to admit—I'll overrule the objection and admit the evidence." Ultimately, the court concluded that a conspiracy was proved. We find no error.

The coconspirator's exception to the hearsay rule has been defined as "Where two or more persons are alleged to have conspired to commit a crime ... any statement made by one, pursuant to or in furtherance of the conspiratorial purpose, is admissible in evidence against any other member of the conspiracy." 16 AM. JUR.2d *Conspiracy* § 46, p. 260, fn. 27 (1979). The Idaho Rules of Evidence, patterned after the Federal Rules of Evidence, go beyond the common law pronouncement and provide that a statement by a coconspirator made during the course of and in furtherance of the conspiracy is not hearsay. I.R.E. 801(d)(2)(E). *See State v. Walker*, 109 Idaho 356, 707 P.2d 467 (Ct. App.1985).

At trial, Hernandez objected to the introduction of the statements of the alleged coconspirator on the grounds that conspiracy had not been charged. The court overruled the objection. This Court has held that it is not necessary that a conspiracy be charged against the coconspirators before the conspirator exception to the admission of hearsay evidence applies. *State v. Brooks*, 103 Idaho 892, 901, 655 P.2d 99, 108 (Ct.App.1982), *citing United States v. Lyles*, 593 F.2d 182 (2d Cir.1979), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Zamarripa*, 544 F.2d 978 (8th Cir.1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977); *United States v. Richardson*, 477 F.2d 1280 (8th Cir.1973), *cert. denied*, 414 U.S. 843, 94 S.Ct. 104, 38 L.Ed.2d 82 (1973); *United States v. Williams*, 435 F.2d 642 (9th Cir.1970), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971). "The coconspirator exception to the hearsay rule is not limited to prosecutions for a conspiracy, but is a rule of evidence applicable to the prosecution of any offense in which coconspirators participate." 16 AM.JUR.2d *Conspiracy* § 46, p. 260, fn. 25 (1979). This Court has also held, however,

that there must be some evidence of the conspiracy, or a promise of its production, before the court can properly admit evidence of statements made in pursuance of the conspiracy. [I]t is discretionary with the trial court to admit proof of declarations and acts of other co-conspirators before proof of conspiracy, and that the subsequent connecting of the one on trial with the conspiracy and the crime is sufficient. [*State v. So*, 71 Idaho 324, 329, 231 P.2d 734, 737 (1951)].

*State v. Brooks*, 103 Idaho at 901, 655 P.2d at 108.

Here, the court admitted Reyes' statements, as testified to by the informant, on the state's promise that it would later prove a conspiracy existed between Reyes and Hernandez. Hernandez argues that the rule that the statements must be made in the course of and in furtherance of the conspiracy logically requires presentation of proof of the conspiracy before the statements can be admitted into evidence. In other words, he asserts that a statement cannot be shown to have been made during an event until the event has been shown to have occurred. Hernandez relies on numerous state and federal decisions requiring the prosecution to make a prima facie showing that a conspiracy existed before the out-of-court statements of the coconspirator can be admitted into evidence. *See generally* ANNOT., *Necessity and Sufficiency of Independent Evidence of Conspiracy to Allow Admission of Extrajudicial Statements of Coconspirators*, 46 A.L.R.3rd 1148 (1972); 16 AM.JUR.2d *Conspiracy* § 46, at p. 259 (1979).

The concern over admitting the statements of alleged coconspirators before showing that a conspiracy existed is that if the prosecution fails in its attempt to "connect up" the evidence to prove a conspiracy, the jury would have heard very prejudicial testimony against the defendant. The court's option at that stage would be to strike the testimony or offer curative jury instructions. Some authorities have suggested that the only way to cure the prejudice may be to declare a mistrial. *Id.*

This case is similar to *State v. Mata,* 107 Idaho 863, 693 P.2d 1065 (Ct.App.1984), with the minor difference that in *Mata,* a conspiracy to violate the Uniform Controlled Substances Act was actually charged and provided the basis for the defendant's conviction. On appeal, the defendant argued that the trial court erred when it admitted the testimony of the confidential informant as to the out-of-court statements made by his coconspirators before there was enough evidence presented to trigger the exception to the hearsay rule. This Court relied on the rule stated in *Brooks* when it affirmed the lower court's decision. We reiterated that Idaho still requires the prosecution to establish a prima facie case showing the existence of a conspiracy in order "to render admissible the extra-judicial statements of an alleged coconspirator in a criminal case." *Mata,* 107 Idaho at 866, 693 P.2d at 1068, *quoting Brooks,* 103 Idaho at 901, 655 P.2d at 108. A prima facie case was defined in *Mata* and *Brooks* as "sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy." *Id.* In *Mata,* this Court found there was sufficient evidence. Hernandez does not argue with the quantum of proof required, but with its order, asserting that the proof of conspiracy must be offered before the conspiratorial statements can come into evidence.

We disagree, and conclude here, as we did in *Mata,* that the statements may be admitted before the conspiracy is established and that here the evidence sufficiently established a conspiracy. In the instant case, the informant testified that the August 24 transaction was set up at the Ritz Bar in Nampa, with the informant, Hernandez, and Reyes making the arrangements while seated at a table. The informant testified that the deal was set up through Reyes, who was acting as intermediary partly because Hernandez did not want to speak directly to the informant and partly because Hernandez and the informant could not hear each other due to the loud music at the bar, even though they sat at the same table. Apparently, Reyes would talk to one party, shuffle his chair to the other side of the table, and talk to the other party until the price, the place for delivery, and the quantity were agreed upon. Later that night, the men drove to a Circle K store in Nampa where Hernandez gave four ounces of cocaine to Reyes, who then gave it to the informant. The informant left the drugs with Reyes. The next day, after contacting the police, the informant picked up the cocaine and paid Reyes $4,400, who then gave the money to Hernandez.

The September 5 transaction also involved four ounces of cocaine and was arranged by the informant and Hernandez to take place at Hernandez' sister's house, although Reyes accompanied the informant on the day of the deal. When at the sister's house, Hernandez told the informant to wait in a nearby park until the drugs arrived. The informant testified that after twenty minutes, Reyes walked into the park with the cocaine hidden on his body. The two men again drove to a local Circle K store where the informant handed the money to Reyes who in turn gave the money to Hernandez. Thereafter, the informant and Reyes delivered the cocaine to an undercover officer posing as the informant's brother.

The September 11 transaction involving eighteen ounces of cocaine came about through negotiations between the informant and Hernandez on September 10. The next day, Hernandez and Reyes drove to the informant's home with the drugs. Reyes entered the informant's car, where the latter was waiting, and told the informant that he had the cocaine, but that it was two ounces short and Hernandez would give him the balance later. At a different location shortly thereafter, the informant spoke with Hernandez, who said he would deliver the missing two ounces in a few days. The police ultimately videotaped Hernandez accepting the $15,000 payment for the drugs, although it was Reyes who actually handed him the money. At trial, Hernandez denied the allegations. However, the state's case was replete with testimony from officers and the informant, cassette tapes of meetings the informant had with the other parties, and video tapes

of the drug deals. The court followed established Idaho law when it allowed the informant to testify to statements made by Hernandez' alleged coconspirator, Reyes, about making drug deals with Hernandez. The court concluded during trial that a conspiracy existed. The jury found the evidence sufficient to convict Hernandez. We find no error in the admission of the evidence.

### Illegal Drug Stamp Tax Act

The jury found Hernandez guilty of violating the 1989 version of the Illegal Drug Stamp Tax Act. See I.C. § 63–4202 through § 63–4208. However, that version of the Act was declared unconstitutional in *State v. Smith,* 120 Idaho 77, 813 P.2d 888 (1991). Although the Act was later corrected, because the version under which Hernandez was prosecuted has been determined to be unconstitutional, his convictions and sentences thereon must be vacated.

### Credit for Jail Time

Hernandez asserts that the trial court erred in that it did not credit his 177 days of presentence jail time to each sentence imposed on the three counts of delivery of a controlled substance. The record, however, refutes this assertion and we conclude that the court correctly credited Hernandez for his presentence confinement.

I.C. § 18–309 states that, when measuring the term of a defendant's imprisonment, the defendant shall receive credit for any period of incarceration served prior to the entry of judgment if the incarceration was for the offense or an included offense for which the judgment was entered. When interpreting this statute in *State v. Hoch,* 102 Idaho 351, 630 P.2d 143 (1981), our Supreme Court held that a defendant who had pled guilty to two charges and received two consecutive sentences would be credited for the 383 days of presentence jail time he had served, but he would not be entitled to 383 days applied to both sentences, or 766 days. In other words, he would not be able to multiply his presentence confinement period by the number of separate sentences he received. The Court held that I.C. § 18–309 revealed no legislative intent to permit a defendant to "pyramid" the credited time simply because he was sentenced to consecutive terms for separate crimes. Here, Hernandez argues for adoption of the reasoning of Justice Bistline in his dissent to *Hoch,* wherein the Justice argued that the presentence period of incarceration should be credited against both sentences, and the defendant should be given a total credit of 766 days. Although the instant case differs from *Hoch* in that, here, concurrent sentences were imposed, the same reasoning and conclusion reached by the majority in *Hoch* should apply.

When addressing an argument similar to Hernandez', the Colorado Supreme Court stated that the purpose behind giving credit for presentence confinement is to eliminate the unequal treatment suffered by indigent defendants who, because of their inability to post bail, are confined longer than their wealthier counterparts. *Massey v. People,* 736 P.2d 19, 21 (Colo.1987). Colorado's statute governing credit for presentence confinement is fundamentally similar to Idaho's.[2] With regard to the statute, the Colorado court held that

> In the case of concurrent sentences, the period of presentence confinement should be credited against each sentence. This is so because concurrent sentences obviously commence at the same time and in functional effect result in one term of imprisonment represented by the longest of the concurrent sentences imposed. Only by giving credit against each concurrent sentence will the defendant be assured of receiving credit for the full period of presentence confinement against the total term of imprisonment. When consecutive sentences are imposed, crediting the period of presentence confinement against one of the sentences will assure the defendant full

---

**2.** Colorado statute 16–11–306 stated in relevant part: "A person who is confined prior to the imposition of sentence is entitled to credit against the term of his sentence for the entire period of such confinement." *Schubert v. People,* 698 P.2d 788, 793 (Colo.1985).

credit against the total term of imprisonment. If only one sentence is ultimately imposed and the other concurrently filed counts or cases are dismissed, then clearly the defendant should be credited with the entire period of presentence confinement served in the sentencing jurisdiction against the sentence.

*Schubert v. People,* 698 P.2d 788, 22 (Colo. 1985). This rule was clarified later when the court stated that "where two or more charges form multiple bases for the defendant's presentence confinement, the defendant is entitled to credit against each sentence imposed on those charges, as long as the credit would not be duplicative." *Massey,* 736 P.2d at 23.

In Hernandez' order of Judgment and Commitment, the court wrote a lengthy paragraph describing the sentences for the convictions on each of the six counts lodged against Hernandez. In that paragraph, the court described the ten to twenty-five year sentence for the first count of delivery of a controlled substance and stated that the sentence would be imposed "with the defendant receiving credit for time served." On Count III, the court imposed its sentence to run concurrently with the sentence in Count I again "with the defendant receiving credit for time served." On Count V, the court imposed another ten to twenty-five year sentence to run concurrently with Counts I and III, "with the defendant receiving credit for time served." Immediately following this paragraph, the court ordered that "the defendant be given credit for one-hundred seventy-seven (177) days of incarceration prior to the entry of judgment for this offense (or included offense) pursuant to Idaho Code Section 18–309."

We view the policy behind the statute to be that a defendant is entitled to have the time he has already served in confinement ascribed to each charge upon which he receives a sentence to be served concurrently, so that if for some reason one of the charges becomes nullified, the defendant is credited for the proper amount of time on the other charge or charges. However, we do not read I.C. § 18–309 to allow the defendant to receive credit for more time than he has actually been in confinement.

Our Supreme Court has adopted the policy that a defendant should not be allowed to "pyramid" his time when consecutive sentences are imposed. The same logic applies to concurrent sentences. *Cf. Ramirez v. State,* 113 Idaho 87, 741 P.2d 374 (Ct.App. 1987); *Daniels v. State,* 491 So.2d 543 (Fla. 1986). Therefore, we hold that the court properly gave Hernandez credit for the 177 days spent in presentence confinement, on each of the sentences imposed.

### Sentences and Rule 35 Motion

Hernandez' final two arguments are that the court imposed excessive sentences and erroneously denied his Rule 35 motion to reduce the sentences. We find no error on either issue. Because the arguments are closely related, we will address them together. A motion for reduction of sentence is essentially a plea for leniency from an unduly severe sentence and such a motion is addressed to the sound discretion of the trial court. *State v. Clayton,* 112 Idaho 1110, 739 P.2d 409 (Ct. App.1987). When reviewing a court's denial of a motion under Rule 35, the appellate court applies the same criteria used for reviewing the reasonableness of the original sentence. *Id.*

Imposition of the original sentence is a matter left to the discretion of the trial court and a sentence fixed within the limits prescribed by statute ordinarily will not be considered an abuse of discretion. *State v. Hedger,* 115 Idaho 598, 768 P.2d 1331 (1989); *State v. Nice,* 103 Idaho 89, 645 P.2d 323 (1982). However, a sentence may represent an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *Nice,* 103 Idaho 89, 645 P.2d 323. A sentence is reasonable if it appears to accomplish the objective of protecting the good order of society and is imposed to achieve any or all of the related goals of deterrence, rehabilitation or retribution. *State v. Toohill,* 103 Idaho 565, 650 P.2d 707 (Ct.App.1982).

When evaluating a sentence imposed under the Unified Sentencing Act, I.C. § 19–2513, the minimum fixed period

generally will be treated as the probable measure of confinement for the purpose of sentence review. *State v. Sanchez*, 115 Idaho 776, 769 P.2d 1148 (Ct.App.1989). We are unable to speculate as to a possible longer term of confinement beyond the minimum term because the Commission on Pardons and Parole is vested with the discretion to grant or deny parole at any time after completion of the fixed term until the expiration of the maximum term. I.C. § 19–2513. *See State v. Bartlett*, 118 Idaho 722, 800 P.2d 118 (Ct.App.1990). Thus, we will treat Hernandez' probable term of confinement as ten years. When reviewing a sentence, we examine the facts in the record independently and focus on the nature of the offense and the character of the offender. *State v. Reinke*, 103 Idaho 771, 653 P.2d 1183 (Ct.App.1982).

Hernandez asserts that his sentences are excessive because he has no felony record and his long history of arrests and misdemeanor convictions is a product of his use of alcohol and mental problems caused by his career as a golden gloves boxer. He argues that the court only considered the objective of punishment to the exclusion of the other sentencing goals of protection of society, deterrence, or the possibility of rehabilitation.

First, we note that Hernandez sentences are within statutory maximums. He could have been sentenced to life in prison. *See* I.C. § 37–2732(a)(1)(A). The court imposed concurrent sentences, as opposed to consecutive ones, recognizing that Hernandez deserved some leniency and could perhaps "get control of [his] life." However, the court also considered the fact that Hernandez sold approximately twenty-six ounces and $23,000 worth of cocaine to the informant within three weeks, with a street value much greater than the price paid by the informant. The record contains information that Hernandez was a member of a larger drug-dealing organization. The court found it apparent "from the proof that you're actively involved in a big way in distribution of drugs in Canyon County." The court stated

Mr. Hernandez, I feel that anything less than putting you in the penitentiary for no less than 10 years would be inappropriate. I think you've dealt drugs in a very serious way and I fear with your temper probably the ten years won't mean anything. That you might end up spending far more than that because of problems that you have or create. I feel because of your age and because of the mental problems that you have that a life sentence at this point would be too— would not give you a chance to ever get control of your life. I would hope that during the time that you're incarcerated and I will recommend that you be thoroughly examined at the secure medical facility for psychological [sic] and that you be given whatever psychological treatment might be helpful to you in getting you—giving you the ability to control your own life.

When imposing the sentences, the court had for its consideration Hernandez' presentence report. The report chronicles Hernandez' convictions for battery, obstructing and delaying a peace officer, and malicious destruction of property and numerous misdemeanor arrests. The presentence investigator found Hernandez to be threatening and "a very dangerous individual." The transcript of the proceedings indicates that he had a serious violent streak and that he was not against using his boxing training to enforce his personal views. He is quoted in the presentence report as stating

I am a hyper and aggressive person. I don't like people telling me what to do. I have a bad temper. When there is too much pressure placed upon me, I go 'off.' If you people send me to the pen and I go off and hurt someone or someone hurts me ..., I will sue you.

At sentencing, Hernandez requested that the judge send him directly to prison instead of first to the Canyon County Sheriff, stating

I've already been here seven months and a week, solitary confinement. I'd rather just go. Send me over there today if it's possible because I don't want to just lose my temper after all this time you gave

me, you know what I mean. Take it out on somebody.

The record indicates that the court considered the psychological problems complained of by Hernandez and commented on by the presentence investigator, and ordered psychological testing and treatment. The court was also aware of his age (29), lack of education, and reported employment as a driver of beet trucks. The record shows that the court actively considered the nature of the offense and the character of the offender when it imposed the sentence; it also shows that the court addressed the appropriate goal of punishment and the related goal of the possibility of rehabilitation.

The court denied Hernandez' motion to reduce his sentence without a hearing, but based on a review of the case file and the affidavit Hernandez submitted in support of his motion. The affidavit merely restated Hernandez' argument at trial that he was not involved in the drug deals and did not deserve the sentence imposed. An additional document contained in the file was a letter from Hernandez' prison social worker. This letter stated that between May 1990 and September 1990, Hernandez received disciplinary write-ups for battery, misconduct, disruptive behavior, and menacing. Although he told the social worker that he would like counseling to change his behavior and was attending a literacy program, church, and Alcoholics Anonymous meetings, he appeared to stress that "his involvement in all these areas will make him 'look good' to the court system" as opposed to help him grow personally.

Based on our review of the record, we find that the court did not abuse its discretion when it imposed the sentences and when it denied the motion to reduce the sentences. *See State v. Baiz*, 120 Idaho 292, 815 P.2d 490 (Ct.App.1991).

## Conclusion

The district court properly exercised its discretion when it refused to appoint an interpreter. Hernandez sufficiently understood and spoke English so that his right to a fair trial was not compromised by the court's refusal. Allowing the confidential informant to testify to the statements of Hernandez' alleged coconspirator was not error because the order in which the proof was offered followed established Idaho law and the court later concluded that a conspiracy existed. Hernandez was properly credited for 177 days of presentence confinement. Also, the court did not abuse its discretion when it imposed the sentences or denied the motion to reduce the sentences. However, the convictions and sentences for violations of the Illegal Drug Stamp Tax Act must be vacated because the version of the Act under which Hernandez was prosecuted was unconstitutional.

For the foregoing reasons, we affirm the judgments of conviction and sentences on the three charges of delivery of a controlled substance, but vacate the convictions and sentences related to the violation of the Illegal Drug Stamp Tax Act.

SWANSTROM, and SILAK, JJ., concur.